583 F.2d 82
 84 Lab.Cas. P 10,769, 1 Employee Benefits Ca 1491
 Edmund KNAUSS, Appellant,
v.
Patrick E. GORMAN, Willard J. Carlson, R. Emmett Kelly,
Irving Stern, Frank Cimino, Fred Clavio, Richard A. Hepp,
Darrell V. Stiffler, John E. Boyd, Monroe M. Rochester and
Oral Moody, Trustees solely in their official capacity, and
Amalgamated Meat Cutters and Butcher Workman's Union and
Industry Pension Fund.
 No. 77-2139.
 United States Court of Appeals,
Third Circuit.
 Argued May 3, 1978.
Decided Aug. 11, 1978.
 
 Michael A. Donadee, Neighborhood Legal Services Ass'n, Pittsburgh, Pa., for appellant.
 Michael J. Boyle, Joseph A. Vater, Jr., Meyer, Unkovic & Scott, Pittsburgh, Pa., for appellees.
 Before ADAMS, VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 We are confronted in this case with two questions regarding employee-union joint pension funds established under the Taft-Hartley Act. First, it is necessary to determine whether certain alleged deficiencies in a pension plan represent "structural defects" over which a federal court may exercise supervision. Second, we must adjudge the circumstances under which a pension plan may divest beneficiaries of pension eligibility without violating the Taft-Hartley requirement that plans be operated for the "sole and exclusive benefit" of employees.
 
 A. FACTS
 
 2
 Edmund Knauss, the appellant, is a retired butcher. Born in 1908, he began work in 1936 for Oswald & Hess Co., a Pittsburgh meat packing firm. His employment with Oswald & Hess continued until the firm's bankruptcy in 1962.
 
 
 3
 In 1957, Local 424 of the Amalgamated Meat Cutters, in cooperation with Oswald & Hess and other meat packers, instituted a multi-employer pension fund pursuant to § 302(c)(5) of the Taft-Hartley Act.[1] Under the terms of the 1957 Fund, participating employers contributed a stipulated amount per year for each employee to fund pension benefits. As an employee of Oswald & Hess, Knauss became a member of the plan, and from 1957 to 1962 payments were made to the pension fund on his behalf.
 
 
 4
 The 1957 Fund provided that benefits were to be granted on retirement at age 65 to an employee who had worked a total of twenty or more uninterrupted years for any employer contributing to the plan.[2] This twenty year requisite could be fulfilled (a) by years worked for an employer prior to the commencement of employer contributions to the plan, denominated "past service credits," and (b) by employment during which contributions were made, denominated "future service credits." Thus, a portion of the benefits to workers employed at the commencement of the plan may be funded out of payments other than those made on their behalf. However, a break in covered employment of more than one year would cancel all credits for years served before the break, whether those years preceded or followed commencement of employer contributions.
 
 
 5
 After Oswald & Hess Co. went bankrupt, Knauss applied to the union hall for work with other employers participating in the Local 424 Plan.[3] When he failed to obtain such employment, he left Pittsburgh for the West Coast. After holding several non-union jobs there, Knauss returned to Pittsburgh in 1966. In May, 1966, Knauss found work at the Northside Packing Plant in Pittsburgh, another employer which contributed to the Local 424 Fund. Knauss continued to work at Northside until 1972, when he was laid off.
 
 
 6
 In the meantime, on January 12, 1970, the Local 424 Fund merged into the Amalgamated Meatcutters' National Pension Fund (the National Fund). By the terms of the merger, the assets of the Local 424 Plan were transferred to the National Fund and the Local Fund went out of existence. In return, the Local Fund's beneficiaries became participants in the National Fund. The merger agreement provided that benefits to former participants in the plan of Local 424 would be governed by the National Fund's standards except that the amount of benefits provided to individuals originally covered by Local 424 would be 75% Of those otherwise available to participants in the National Fund.
 
 
 7
 Under the National Fund's rules, a minimum of ten years of employment with a covered employer was a prerequisite to collecting pension benefits. Like the Local 424 Fund, the National Fund recognized both "past" and "future" service credits to satisfy the prerequisite, but, with some exceptions to be discussed, the National Plan denied credit for employment which occurred prior to a break of more than two years in covered service.DP Upon being laid off by Northside in 1972, Knauss applied to the National Fund for pension benefits. His claim was denied, despite the fact that his employers had contributed to Amalgamated funds on Knauss' behalf for a total of 11 years, and despite the fact that he had registered a total of 32 years of employment with covered employers. The National Fund's administrators determined that only the six years of service following his break in employment could be credited to Knauss' account, and that his remaining twenty-six years of service were to be disregarded.
 
 
 8
 After attempting unsuccessfully to have this decision reversed administratively, Knauss brought suit against the National Fund and its trustees in the district court under § 302(e)[4] of the Taft-Hartley Act. He claimed that the provision denying credits for contributions prior to a break in service was arbitrary and capricious, and therefore violated the requirement of § 302(c)(5) that joint employer-union pension plans be operated for the "sole and exclusive benefit" of employees.
 
 
 9
 Following a non-jury trial, the district court entered judgment against Knauss. The trial judge determined that he had jurisdiction of the claim under § 302(e). However, despite a belief that the break-in-service clause was "unfair," the trial judge held that because there was no proof that the break-in-service provision affected more than a single individual, the unfairness could not constitute a "structural defect" cognizable under § 302.
 
 
 10
 Knauss then filed a timely appeal. We vacate the judgment and remand.
 
 B. STRUCTURAL VIOLATION
 
 11
 § 302 of the Taft-Hartley Act prohibits payments to unions by employers. § 302(c)(5), however, fashions an exception to that prohibition for monies "paid to a trust fund established . . . for the sole and exclusive benefit of the employees of such employer, and their families and dependents," provided that such a trust fund meets certain statutory requirements.[5] § 302(e) of the Act affirms that federal district courts have jurisdiction "to restrain violations of this section." Our first inquiry thus must be whether Knauss has set forth a claim cognizable under § 302.
 
 
 12
 In Associated Contractors v. Laborers International Union,[6] we noted that "although the extent of jurisdiction under § 302(e) is not yet settled, this much is certain: a federal court does have jurisdiction under the section to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception."[7] Likewise, in this case we have no occasion to define further the reach of § 302, for as we said in Nedd v. UMW,[8] the allegation of such a "structural" violation is sufficient to vest the court with jurisdiction.[9]
 
 
 13
 Here, Knauss alleges that the break-in-service provision of the rules of the National Fund arbitrarily excludes employees from benefits, and therefore does not operate for the sole and exclusive benefit of employees as required by § 302(c)(5). On its face, such an alleged defect would appear to support an action under § 302(e).
 
 
 14
 The trustees suggest, however, and the district court held, that a provision of a pension plan which allegedly violates the "sole and exclusive benefit" standard does not constitute a "structural defect" absent proof that a large number of potential beneficiaries are excluded by its operation. Thus, it is argued, since Knauss has not submitted evidence that other workers are also excluded by the operation of the break-in-service clause which he challenges, the provision cannot constitute a "structural" violation.
 
 
 15
 We note some tension between this argument by the trustees as to jurisdiction, and the trustees' claim on the merits that the break-in-service clause is necessary to preserve the plan's actuarial viability. If Knauss were the only individual affected by the clause, the actuarial stability of the pension plan would hardly be augmented by the clause's existence. If, as the trustees maintain, the clause is actuarially "necessary," A fortiori it must have effects that are broader than simply excluding Knauss.
 
 
 16
 In any event, if the break-in-service clause does arbitrarily and without justification bar otherwise eligible workers from pension benefits, it constitutes a "structural violation" cognizable under § 302(e), although only a single individual is currently affected. As the Seventh Circuit noted in Johnson v. Botica,[10] there are "some analytic difficulties in the use of the structural deficiency standard." Nonetheless, the distinction is rooted in the perception that Congress did not necessarily intend § 302(e) as a conduit to carry to the federal courts every claim for benefits denied by a § 302(c)(5) pension fund. Day-to-day discretionary decisions by the administrators of funds are not subject to continuous audit by federal courts. However, where a settled requirement capriciously excludes employees from benefits, it is not the prudence of the plan's administration which is at issue, but the fairness of its basic structure. Such an exclusion constitutes a failure to conform to the "sole and exclusive benefit" requirement, and thus may be reviewed in the federal courts without doing violence to the Congressional intent.
 
 
 17
 While there is language in some opinions asserting that a structural defect is one which excludes " a sizeable number of union members,"[11] the holdings of the various courts of appeals which have dealt with the issue consistently support the proposition that a settled eligibility prerequisite which is arbitrary and capricious constitutes a "structural defect," even if no specific enumeration of the beneficiaries excluded by such a requirement is produced at trial. Thus, for example, in Burroughs v. Board of Trustees, the case which contained the language relied on by the trustees, the Ninth Circuit struck down the application of a break-in-service clause to an individual despite the fact that the trial court made no findings[12] and the court of appeals adverted to no evidence that the clause affected any employees other than the plaintiff.
 
 
 18
 Adopting the reasoning of the trial court, the Ninth Circuit declared that a cognizable violation would be present "Whether the unjust exclusion of A pensioner is obtained from the exclusive provisions of the trust fund itself or from the arbitrary and exclusionary implementation procedures of the trustees . . . ."[13] This interpretation in Burroughs appears to be a reasonable one. In the case of a generally applicable exclusionary provision, even if only one individual is initially implicated, others who may become eligible in the future are potentially deprived of their rights. There is no justification for holding that the first individual to be arbitrarily denied a pension under a particular provision should be forced to await redress until others are similarly discriminated against.
 
 
 19
 We therefore hold that Knauss met the burden of establishing the "structural" nature of the alleged violation even though he failed to come forward with evidence that others were currently affected by it.
 
 C. SOLE AND EXCLUSIVE BENEFIT
 
 20
 Section 302(c)(5) exempts from its prohibition of employer payments to labor unions contributions to pension funds established for the "sole and exclusive benefit" of employees and their families. The Taft-Hartley Act itself, however, does not define the dimensions of the "sole and exclusive benefit" requirement.
 
 
 21
 The legislative history of § 302(c)(5), set forth in Arroyo v. United States,[14] indicates that the section was drafted to govern the emerging practice of establishing union-controlled "welfare funds," financed by employer contributions.[15] Part of the impetus for Congressional concern lay in the potential for "corruption of collective bargaining through bribery of employee representatives by employers with extortion by employee representatives."[16] With equal emphasis, however, Congress wished to safeguard the sums paid into welfare funds "representing as they do the value of the services of the union members which could otherwise be paid to the union members in wages" against the abuse of "arbitrary dispensation by union officers."[17]
 
 
 22
 In recognition of this latter element of the policy nourishing § 302, courts have held the "sole and exclusive benefit" standard to embody a prohibition of arbitrary exclusions from pension benefits.[18] Thus, for example, in Norton v. IAM Ntl. Pension Fund,[19] the court struck down a provision denying pension benefits to an otherwise qualified individual who had been divested of pension rights when his local changed union affiliations, while he retained his original allegiance. The court in Burroughs, supra,[20] held that a retroactive application of a length-of-service prerequisite of "employees . . . who had no notice of its existence and hence no reasonable opportunity to protect themselves from its impact" violated the sole and exclusive benefit requirement. And a series of cases in the District of Columbia Circuit have mandated the grant of benefits that had been denied under a requirement that the last employer of pension applicants be a contributor to the plan, when that requirement applied regardless of the amount of prior contributions made on an employee's behalf.[21]
 
 
 23
 Here, the break-in-service clause gives rise to apparently arbitrary distinctions. But for the cancellation effected by his interruption in employment, Knauss had accumulated more than sufficient years of service with contributing packers to entitle him to a pension under the standard established by the National Fund. He therefore would have been entitled to a pension absent the break-in-service provision. Similarly, an employee otherwise identical with Knauss whose lapse in employment occurred from 1953 to 1957, instead of from 1962 to 1966, would obtain benefits under the National Fund.
 
 
 24
 The four-year hiatus barred Knauss' entitlement notwithstanding the fact that his failure to continue work arose not out of any voluntary abandonment by him of employment with contributing packers, but from the bankruptcy of Oswald & Hess and from the unavailability of positions with other covered employers. Yet breaks in service are forgiven under the National Plan in the case of employees whose employment lacunae arise because they were self-employed, were union officers, were striking, were transferred to supervisory roles by their employer or worked part-time.[22] And had Knauss been 60 years of age instead of 54 when his employer went out of business, he would have been entitled to benefits with no more contributions than those which had already been offered in his behalf.[23]
 
 
 25
 Doubts raised by such disparities are exacerbated by the fact that the break-in-service provision causes Knauss to forfeit entirely the eleven years of employer contributions to the fund made on his behalf, contributions greater than those necessary to support a vested right to a pension under the terms of the National Plan. The architects of § 302(c)(5) understood contributions to a welfare fund to constitute payments in lieu of wages to the fund's beneficiaries, and sought to ensure that employees whose work generated contributions would obtain the benefit of such funds.[24] A prerequisite that divests the employee on whose account contributions were made because of an involuntary break in service, and that distributes those contributions to other employees, seems to be at odds with the Congressional intent in enacting the "sole and exclusive benefit" requirement. Indeed, one of the examples adduced by Senator Taft, a principal sponsor of the Act, regarding the difficulties to which § 302(c)(5) was addressed, arose from a proposed welfare fund for the benefit of members of the local painters' union in the District of Columbia. Senator Taft commented:
 
 
 26
 Painters are notorious drifters. They have something deducted from their wages, and then they drift on to some other city where they may find no fund and lose the money they have already contributed.[25]
 
 
 27
 The apprehension expressed by Senator Taft that employees will unfairly "lose" the benefit of contributions made on their behalf is equally applicable when the loss comes about from a formal break-in-service clause. Thus, at least where a break-in-service provision deprives an otherwise eligible employee of all benefits derived from substantial contributions made in his behalf, § 302(c)(5) requires that the defenders of such provision come forward with substantial justification for the stipulation in terms of the Fund's legitimate goals.[26] We turn therefore to the possible justifications for the clause at issue.
 
 
 28
 From an employer's point of view, a pension plan is like other employment benefits; it is an incentive to worker productivity. It may therefore be that an employer or group of employers will wish to encourage the continuity of its workforce by denying benefits to "occasional" employees. Whatever the merits of this justification in other situations,[27] it can have little applicability here, for any incentive to employee loyalty is superfluous in the situation where the employer has gone out of business and no new employment opportunities exist.
 
 
 29
 Rather, the trustees here rely upon the interests of the employees in maintaining the actuarial viability of the pension fund.[28] Any harshness that results from the break-in-service clause, the defendants claim, is necessary to ensure that the fund continues to serve the majority of the beneficiaries.
 
 
 30
 The only testimony offered by the defendants in support of this position was that of Joseph Barron, an official of the National Fund. Barron's testimony is far from pellucid. It appears, however, that Barron, who was not qualified as an expert witness, advanced the position that the break-in-service clause was an effort to obtain "consistent continuous payment for covered employees." Such continuity in turn was said to be necessary to fund the payment of pension obligations accruing on the basis of "past service credits" for which no contributions had been made.[29]
 
 
 31
 As support for the break-in-service clause, Barron's comments are open to the same objection previously discussed in relation to justification of ensuring loyalty to employers. If, as in Knauss' case, no jobs are available, the attempt to ensure "consistent and continuous payment" to finance current, unfunded obligations becomes fruitless. With or without the incentive of the break-in-service clause, the payments cannot be more consistent or continuous than the number of jobs available permits. Indeed, as a general rule, the pension funds that have break-in-service clauses do not apply such clauses where the beneficiary terminates employment involuntarily.[30]
 
 
 32
 Despite the fact that the defendants have not adduced persuasive evidence of the actuarial necessity for the break-in-service clause, the trustees suggested in their brief and at oral argument that, at least at the time that Knauss was denied benefits, the break-in-service clause was necessary to the viability of the Plan, and that invalidation of the clause would endanger the availability of benefits to pensioners other than Knauss. We are most reluctant to order the entry of any decree that would threaten the solvency of the National Fund, for the purposes of § 302 would be ill-served by sacrificing the security of the Plan's other beneficiaries.[31] Thus, rather than order a potentially drastic result on the basis of a scanty factual predicate, we will remand this case for the purpose of allowing the trial court to receive additional testimony, to make findings as to the actuarial necessity of the break-in-service clause, and to enter judgment based on those findings.[32]
 
 
 33
 The judgment of the district court will be vacated and the case remanded for action in accordance with this opinion.
 
 
 
 [1]
 29 U.S.C. § 186(c)(5)
 
 
 [2]
 In July, 1962, the 1957 Plan was amended. App. 94. A number of changes were made, but none are pertinent to this case
 
 
 [3]
 App. 22, 31-32
 
 
 [4]
 § 302(e) of the Act provides:
 (e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of sections 101-115 of this title.
 Knauss also stated a claim under the Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1001 et seq. The district court held that since the denial at issue occurred before the effective date of ERISA, Knauss had no cause of action. This determination was not challenged on appeal.
 
 
 [5]
 The exception applies
 with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities . . . .
 
 
 [6]
 559 F.2d 222 (3d Cir. 1977)
 
 
 [7]
 559 F.2d at 225. See Arroyo v. United States, 359 U.S. 419, 426-27, 79 S.Ct. 864, 869, 3 L.Ed.2d 915 (1959) ("Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e)")
 
 
 [8]
 556 F.2d 190, 201 n. 18 (3d Cir. 1977) Cert. denied 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757
 
 
 [9]
 Other courts have likewise adopted the position that "structural violations" may be remedied under § 302(e). E. g. Riley v. MEBA Pension Trust, 570 F.2d 406 (2d Cir. 1977); Lugo v. Employees Retirement Fund, 529 F.2d 251 (2d Cir.) cert. denied 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); Johnson v. Botica, 537 F.2d 930 (7th Cir. 1976); Wilson v. Board of Trustees, 564 F.2d 1299 (9th Cir. 1977); Burroughs v. Bd. of Trustees, 542 F.2d 1128 (9th Cir. 1976) cert. denied 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); Alvares v. Erickson, 514 F.2d 156 (9th Cir.) cert. denied 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975). See, e. g. Norton v. IAM National Pension Fund, 180 U.S.App.D.C. 176, 553 F.2d 1352 (1977) (evaluating a § 302 fund against an "arbitrary and capricious standard); Local No. 5 v. Mahoning and Trumbull County Trades Welfare Fund, 541 F.2d 636 (6th Cir. 1976) (Semble ) Gomez v. Lewis, 414 F.2d 1312 (3d Cir. 1969) (Semble ). Cf. Bowers v. Moreno, 520 F.2d 843 (1st Cir. 1975) (reading scope of "structural violation" narrowly); Bowers v. Ulpiano Casal, 393 F.2d 421 (1st Cir. 1968) (Semble )
 There is some uncertainty whether § 302(e) in fact confers jurisdiction, or merely authorizes a cause of action and withdraws a bar to jurisdiction under 28 U.S.C. § 1331 and § 1337. See Associated Contractors, supra, 559 F.2d at 225; Nedd, supra, 556 F.2d at 201-202 and accompanying notes. Under either view, jurisdiction is present here.
 Likewise, we need not resolve the issue whether § 302 authorizes an action for violations which are not "structural" in nature since we conclude that such a violation exists in this case.
 
 
 [10]
 537 F.2d 930, 934 (7th Cir. 1976)
 
 
 [11]
 Burroughs v. Bd. of Trustees, 542 F.2d 1128, 1131 (9th Cir. 1976), Cert. denied, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1077); See Insley v. Joyce, 330 F.Supp. 1228, 1233-34 (M.D.Ill.1971)
 
 
 [12]
 See 398 F.Supp. 168 (N.D.Cal.1975)
 
 
 [13]
 542 F.2d at 1131. See, e. g. Wilson v. Board of Trustes, 564 F.2d 1299 (9th Cir. 1977), (The court took § 302 jurisdiction over a claim that a break-in-service provision was arbitrary and capricious as applied to the particular circumstances of the plaintiff. Although no reference is made to any evidence that others were affected adversely by the rule, the court stated that Wilson's allegation "comfortably fits within the 'structural' deficiency category, and no serious question with respect to our jurisdiction exists in this case."); Alvares v. Erickson, 514 F.2d 156, 166 (9th Cir. 1975) (approving statement that "a trust fund which authorizes the trustees to act arbitrarily and capriciously to exclude from eligibility certain potential employee-beneficiaries, has a structural defect . . . ."); Lee v. Nesbitt, 453 F.2d 1309 (9th Cir. 1975) (striking down a break-in-service clause as applied to one individual employee whose break-in-service was involuntary); Norton v. IAM National Pension Fund, 180 U.S.App.D.C. 176, 553 F.2d 1352 (1977) (striking down under § 302 a clause which apparently applied to exclude only a single individual); Riley v. MEBA Pension Trust, 570 F.2d 406 (2d Cir. 1977) (reviewing an exclusionary provision which affected only a single individual under § 302, but finding it not arbitrary or capricious)
 While Insley v. Joyce, supra, a class action, based its jurisdictional argument on the fact that "substantial numbers" of potential beneficiaries were excluded by a break-in-service clause, this position was apparently rejected by Johnson v. Botica, 537 F.2d 930 (7th Cir. 1976). In Johnson, the Seventh Circuit affirmed the assumption of jurisdiction by the district court over a claim that the plan at issue arbitrarily excluded the plaintiff, whose heart attack prevented him from achieving the requisite length of covered employment. The Court upheld this determination on the ground that the challenge alleged a structural defect. No mention is made in the opinion of the number of employees affected by the clause, other than the plaintiffs who may have been affected.
 
 
 [14]
 359 U.S. 419, 425 n. 6, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959)
 
 
 [15]
 See id.; S.Rept. n. 105 on S. 1126, Supplemental Views Reprinted in II NLRB, Legislative History of the Labor Management Relation Act of 1947 468 (1948); Remarks of Senator Taft, 93 Cong.Rec. 4875 (1947) in NLRB History at 1310
 
 
 [16]
 Arroyo, supra 359 U.S. at 425-26, 79 S.Ct. at 868; Walsh v. Schlecht, 429 U.S. 401, 410-11, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977)
 
 
 [17]
 Supplemental Views, supra note 15 at 458. See Arroyo supra, 359 U.S. at 426, 79 S.Ct. at 868 ("abuse by union officers of power which they might achieve if welfare funds were left to their sole control.") Remarks of Senator Taft 93 Cong.Rec. 4876, NLRB History at 1310 (welfare funds currently open to "indiscriminate" use); Id. 93 Cong.Rec. 4876 NLRB History at 1311 ("should not be subject to the arbitrary discretion of the union leaders")
 
 
 [18]
 E. g. Gomez v. Lewis, 414 F.2d 1312 (3d Cir. 1969); Riley v. MEBA Pension Trust, 570 F.2d 406 (2d Cir. 1977); Johnson v. Botica, 537 F.2d 930 (7th Cir. 1976); Wilson v. Board of Trustees, 564 F.2d 1299 (9th Cir. 1977); Giler v. Board of Sheet Metal Workers, 509 F.2d 848 (9th Cir. 1975); Lee v. Nesbitt, 453 F.2d 1309 (9th Cir. 1972). See Local No. 5 v. Mahoning and Trumbull County Trades Welfare Fund, 541 F.2d 636 (6th Cir. 1976) (§ 302 may also prohibit certain provisions which are not arbitrary and capricious)
 
 
 [19]
 180 U.S.App.D.C. 176, 553 F.2d 1352 (1977)
 
 
 [20]
 542 F.2d 1128 (9th Cir. 1976) Cert. denied 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977)
 
 
 [21]
 See Pete v. United Mine Workers of America Welfare & Retirement Fund, 171 U.S.App.D.C. 1, 517 F.2d 1275 (1975) (en banc); Teston v. Carey, 150 U.S.App.D.C. 256, 464 F.2d 765 (1972); DePaoli v. Boyle, 144 U.S.App.D.C. 364, 447 F.2d 334 (1971); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970); Collins v. UMWA Welfare and Retirement Fund, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970); Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425 (1968)
 
 
 [22]
 National Fund Rules Article V, sections 5(b)-(g), App. 187-88
 
 
 [23]
 Local 424 Fund Rules, Sec. 4(2), App. 98-99
 
 
 [24]
 Supplemental Views supra note 15 at 458; Remarks of Senator Taft, 93 Cong.Rec. 4876, NLRB History at 1311 ("It is money earned by the employees"; "it is in trust for the employees who after all have earned the money."); Id. at 1312 ("We are saying to the employee 'You have earned 100 of this money, but all you get is 95. You must put $5 into the fund' "); Remarks of Senator Ball, 93 Cong.Rec. 4887, NLRB History at 1321 ("on any reasonable basis, payments by an employer to such a fund are in effect compensation to his employees"); Id. 1322 ("all we seek to do by the amendment is to make sure that the employees whose labor builds this fund and who are really entitled to the benefits under it shall receive the benefits.")
 
 
 [25]
 93 Cong.Rec. 4877, NLRB History at 1312
 
 
 [26]
 Break-in-service clauses subjected to attack under the imperatives of the "sole and exclusive benefit" requirement have in a number of cases failed to survive a prohibition on arbitrary and capricious exclusions. See e. g. Lee v. Nesbitt, 453 F.2d 1309 (9th Cir. 1972); Burroughs v. Board of Trustees, 542 F.2d 1128 (9th Cir. 1976) Cert. denied 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); Mosley v. National Maritime Union Pension and Welfare Fund, 438 F.Supp. 413 (E.D.N.Y.1977); Insley v. Joyce, 330 F.Supp. 1228 (N.D.Ill.1971)
 Both plaintiff and defendants attempt to draw support from ERISA. The plaintiff points out that 29 U.S.C. § 1054(b)(3) allows breaks in service to divest previous pension credits only until the employee returns to covered employment and works for a year at such employment, thus implying that permanent divestment is disfavored by federal policy. See Mosley v. National Maritime Union Pension & Welf. Fund. The defendants retort that this provision is rendered inapplicable to breaks occurring before the effective date of ERISA 29 U.S.C. § 1053 b 1 F. They therefore discern a Congressional imprimatur on the applicability of break-in-service provisions before that date. See Lugo v. Employees Retirement Fund, 529 F.2d at 255, Cert. denied 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed. 88 (2d Cir. 1976); Riley v. MEBA Pension Trust, 570 F.2d 406, 413 (2d Cir. 1977).
 Notwithstanding the potential implications which can be drawn from other provisions, 29 U.S.C. § 1144(d) of ERISA convinces us that we cannot properly rest a decision in this case on either the implications of the Congressional vesting requirement or the failure to make such requirement retroactive. That section reads:
 Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States . . . or any rule or regulation issued under any such law.
 
 
 [27]
 Cf. Senator Taft's remarks Supra
 
 
 [28]
 Defendants also maintain that it would be improper to saddle the National Fund with liability for benefits greater than that to which the Local 424 fund declared itself subject at the time of the merger. We find this contention unpersuasive
 The National Fund obtained the assets of the Local 424 fund, including the contributions paid into the Local fund on Knauss' behalf. If the provision by which these contributions were escheated to the Local Fund clearly violated § 302, for instance by denying benefits to opponents of the Local president, it could not be argued that the National Fund would be insulated from liability. Moreover, since the eligibility of Local Fund beneficiaries is determined in accordance with National standards under the merger agreement, the issue is the validity of the National break-in-service clause, the possible impropriety of which cannot be attributed to the Local Fund.
 
 
 [29]
 The totality of Barron's statement on the subject reads as follows:
 Well, with respect to multi-employer plans such as this plan, of course, where they provide a credit for past service for which no contribution has been made there becomes an obligation to give future service payments to meet that obligation of the past service plus the future service and this must come out of contributions made by the employer for people who are currently working. Therefore, the Union endeavors to get consistent continuous payment from covered employees until the time that they reach retirement age or an age which they would qualify for retirement.
 
 
 [30]
 Lee v. Nesbitt, 453 F.2d 1309, 1312 n. 3 (9th Cir. 1972). This aspect also serves to distinguish Foley v. Devaney, 528 F.2d 888 (3d Cir. 1976), where this Court enforced a break-in-service clause not covered by § 302. The clause in Foley exempted breaks in service which occurred on account of the unavailability of covered employment
 The decisions in Wilson v. Board of Trustees, 564 F.2d 1299 (9th Cir. 1977) and Giler v. Board of Trustees, 509 F.2d 848 (9th Cir. 1975) also involved break-in-service clauses containing exceptions for involuntary lapses in service. The holdings that such clauses were not arbitrary and capricious were predicated on that fact.
 
 
 [31]
 See e. g. Roark v. Lewis, 130 U.S.App.D.C. 360, 363, 364, 401 F.2d 425, 428-29 (1968) (remanding for development of justifications for exclusionary clause despite the fact that both parties had stipulated facts, because of unwillingness to formulate a potentially "far-reaching" opinion); Mosley v. National Maritime Union Pension & Welf. Plan, 438 F.Supp. 413, 427 (E.D.N.Y.1977) (ordering evidentiary hearing to consider economic justifications for a break-in-service clause
 
 
 [32]
 See 28 U.S.C. § 2106; Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950)
 We are encouraged to take this step by the fact that at oral argument the plaintiff as well as the defendant advanced arguments in favor of a remand.