**LOCAL 50, BAKERY AND CONFEC-
TIONERY WORKERS UNION, AFL–
CIO, Health Benefits Fund and Trus-
tees of the Local 50 Bakery and Confec-
tionery Workers Union, AFL–CIO,
Health Benefits Fund, Plaintiffs-Appel-
lants,**

**v.**

**LOCAL 3, BAKERY AND CONFEC-
TIONERY WORKERS UNION, AFL–
CIO, Welfare Fund and Trustees of the
Local 3, Bakery and Confectionery
Workers Union, AFL–CIO, Welfare
Fund, Defendants-Appellees,**

**and**

**Entenmann's Inc., Intervenor-Appellee.**

**No. 486, Docket 83–7648.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 12, 1983.

Decided April 19, 1984.

Jerome Tauber, New York City (Brian O'Dwyer, Joseph Licata, O'Dwyer & Bernstien, New York City, I. Philip Sipser, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, of counsel), for plaintiffs-appellants.

Stephen L. Fine, New York City (Ann W. Schulman, Cohn, Glickstein, Lurie, Ostrin, Lubell & Lubell, New York City, of counsel), for defendants-appellees.

Raymond J. Soffientini, New York City (Michael J. Saltser, Battle, Fowler, Jaffin & Kheel, New York City, of counsel), for intervenor-appellee.

Before MESKILL, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

The principal issue presented on this appeal is to what extent a union's health benefits fund must account to a successor union's fund, and vice versa, for employer contributions and insurance payments previously made on behalf of employees who have since shifted their union allegiance from one local to another. Nearly a million dollars is at stake in the immediate dispute. Equally important are the far reaching con-

sequences of our decision, for today's determination necessarily touches on important questions of federal jurisdiction as well as the policies underlying an employee's freedom to choose his collective bargaining representative.

Plaintiffs, a union local and its affiliated health benefits fund, appeal from an order of the United States District Court for the Eastern District of New York (Platt, J.) entered March 28, 1983, denying their motions for summary judgment on their claims and granting defendants' and intervenor's motion for summary judgment on their counterclaims. On June 24, 1983 the district court entered a final judgment in favor of defendants on the counterclaim in the amount of $459,251 plus prejudgment interest of $246,532.27 and dismissed plaintiffs' claims.

## I BACKGROUND

Entenmann's, Inc., famous for its chocolate chip cookies and other baked goods, owns and operates a bakery in Bayshore, Long Island, where it employs about 2,000 workers. Local 50, Bakery and Confectionery Workers Union, AFL–CIO and Local 3, Bakery and Confectionery Workers Union, AFL–CIO are affiliates of the International Union of Bakery, Confectionery and Tobacco Workers Union and, for collective bargaining purposes, represent baking industry employees in the New York area. Pursuant to collective bargaining and trust agreements, each Local established a pooled, multiemployer welfare fund. Both funds are trust funds within the meaning of section 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5) (1982), and benefit plans for purposes of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002 (1982). Accordingly, contributions are made to them from employers, like Entenmann's, on behalf of their employees, and fund proceeds are used to purchase insurance, which provides group health and welfare benefits for those employees and their dependents.

For many years prior to September 1, 1979 Entenmann's employees were represented by Local 50. All employer contributions were paid into the Local 50, Bakery and Confectionery Workers Union, AFL–CIO, Health Benefits Fund (Local 50 Fund or Local 50), and the trustees of that Fund were responsible both for purchasing insurance and distributing employee benefits. In early August, 1979 Entenmann's workers voted to make Local 3 their new bargaining representative, effective September 1. The Local 3, Bakery and Confectionery Workers Union, AFL–CIO, Welfare Fund (Local 3 Fund or Local 3) was to become the depository of Entenmann's contributions, and its trustees were to assume the duties then held by the Local 50 Fund's trustees.

To facilitate an orderly transfer of responsibilities, the parties agreed (without prejudice to their claims now before us) that Local 50 would pay the insurance premiums, due September 1, covering Entenmann's employees for the month of September and Entenmann's would make its monthly contribution, due September 15, directly to Local 3. Thus, Local 50 paid the September 1 premium of $101,228.58, and Entenmann's paid to Local 3 the September 15 welfare contribution of $151,837.58. Apart from these two sums there existed in the Local 50 Fund a reserve of approximately $3,450,416 as of October 1, 1979. A portion of this reserve represented past contributions made by Entenmann's on behalf of its employees (Entenmann's employees allegedly constituted more than 25 percent of the Fund's participants). Since Local 50 did not transfer any part of this reserve to Local 3, it would subsequently have inured solely to the benefit of the remaining participants in the Local 50 Fund, and Entenmann's workers would have derived no benefit from that portion of their past contributions.

As made clear by the ensuing claims and counterclaims, neither Local was content with these arrangements. Local 50, plaintiff-appellant in this action, asserted in its amended complaint that because Local 3 represented Entenmann's employees as of September 1, 1979 the insurance premiums

due that day should have been paid by the Local 3 Fund. Additionally, it alleged that because Entenmann's September 15 contribution was based on the number of hours worked by its employees during August 1979 (when they were represented by Local 50), that contribution should have been made to the Local 50 Fund. As a result, Local 50 and its trustees sought to be repaid both the September 1 premium payment of $101,228.58 and the September 15 welfare contribution of $151,837.58. In its answer Local 3 denied that it owed Local 50 these two amounts and asserted as a counterclaim that the reserves in the Local 50 Fund attributable to past payments made by Entenmann's on behalf of its employees should be paid over to it. Entenmann's successfully intervened in this action. It sided with Local 3 and argued that the court's disposition of the counterclaim would have a serious impact on the amount of future contributions it might be compelled to make.

Following discovery, both Funds moved for summary judgment on all claims and counterclaims. In a published opinion dated March 28, 1983 the district court dismissed the claims of Local 50 and rendered judgment for Local 3 on its counterclaim. *Local 50, Bakery and Confectionery Workers Union, AFL–CIO, Health Benefits Fund v. Local 3, Bakery and Confectionery Workers Union, AFL–CIO, Welfare Fund*, 561 F.Supp. 205 (E.D.N.Y. 1983).

With respect to Local 50's claims, Judge Platt reasoned that in as much as insurance premiums must be paid before benefits will be provided and because a welfare fund must build reserves before it is in a position to pay insurance premiums, employer contributions must be made before the welfare fund can make premium payments, not the other way around as Local 50 argues. In other words, first, the employer makes its contributions to the fund, then, when a reserve is built, the fund pays insurance premiums and, finally, the employees receive their insurance benefits. Local 50 received contributions from Entenmann's prior to September 1 and built a reserve for the sole purpose of paying future premiums. Therefore, it was obliged to pay the September 1 premium from those reserves. Judge Platt reasoned similarly with regard to Entenmann's September 15 contribution. He believed that the number of hours its employees worked in August, 1979 was not the relevant factor, but rather that the contribution was earmarked for the payment of insurance premiums in October and thereafter.

Judge Platt's separate analysis of the counterclaim turns primarily on issues of federal jurisdiction. Without resolving whether Local 3's counterclaim was compulsory, he found an independent jurisdictional basis in section 302(e) of the LMRA. He concluded that this provision empowers federal courts to remedy structural defects in employee welfare funds, and that a plan whose provision violated section 302(c)(5)— providing that welfare fund contributions must be "for the sole and exclusive benefit of the employees of such employer, and their families and dependents"—constituted a structural defect. Accordingly, Judge Platt ordered Local 50 to pay to Local 3 that portion of its reserves attributable to Entenmann's so that Entenmann's contributions would inure to the "sole and exclusive benefit of [its] employees."

We find the district court's analysis quite compelling, at least with respect to Local 3's counterclaim and that portion of Local 50's claim arising from the September 1, 1979 insurance premium payment. Entenmann's September 15 contribution, however, is another matter. Because that contribution was based on the number of hours worked by Entenmann's employees in August, it makes sense to infer that the contribution accrued during the month of August—a month in which Entenmann's employees were represented by Local 50. Accordingly, we believe Entenmann's should have paid its September 15 contribution to the Local 50 Fund. This, in turn, would increase the amount of Local 50 Fund reserves attributable to Entenmann's and thus the amount of reserves the Local

50 Fund must transfer to the Local 3 Fund on its counterclaim.

In light of these modifications, the details of which are set forth below, the judgment of the district court is affirmed in part and reversed in part.

## II EQUITIES

Before beginning an analysis of the law, it is helpful to recognize some of the equities at issue. On its face, this case deals with the rights of employees to reap the benefits of employer contributions made in lieu of wages. Viewed in this light, the problem here might be considered one of entitlement on the part of Entenmann's employees or, alternatively, unjust enrichment of those workers who retain Local 50 as their collective bargaining representative.

Yet a more fundamental problem exists—one that strikes at the very core of collective representation. Specifically, were we to hold that Local 50 may retain the contributions made by Entenmann's on behalf of its employees, we would be imposing a great disincentive for employees ever to change bargaining representatives. Faced with the devil's alternative of either forfeiting their right to a substantial sum of employer contributions or retaining a collective bargaining representative with which they are less than satisfied, employees may well choose the latter. Such a result would not only impinge on free choice in representation, but would also permit unions without penalty to them to become less attentive to their constituencies' demands. See Summers, Union Schism in Perspective, 45 Va.L.Rev. 261, 279 n. 84 (1959). We see no necessity to make employees choose between two such bad bargains.

## III LOCAL 3'S COUNTERCLAIM

From a monetary standpoint Local 3's counterclaim is the major component of this litigation. Moreover, its disposition from a practical standpoint bears directly on Local 50's claims. For these reasons, we turn to the counterclaim first.

### A. Jurisdiction

Simply restated, Local 3's counterclaim seeks to have the Local 50 Fund relinquish that portion of its reserves attributable to Entenmann's contributions. Local 50 argues here, as it did in district court, that federal courts lack subject matter jurisdiction over this counterclaim. In response, Local 3 advances two grounds for jurisdiction: first, that the counterclaim was compulsory pursuant to Fed.R.Civ.P. 13(a) and thus cognizable under the doctrine of ancillary jurisdiction and, second, that even if the counterclaim was deemed permissive, sections 302(c)(5) and (e) of the LMRA provide an independent jurisdictional basis. Since the district court found that LMRA sections 302(c)(5) and (e) bestowed jurisdiction, it did not reach the issue of whether the counterclaim was compulsory or permissive.

The scope of federal jurisdiction under sections 302(c)(5) and (e) is far from settled. In *Valle v. Joint Plumbing Industry Board*, 623 F.2d 196, 201 n. 8 (2d Cir.1980), this Court found that section 302(e) "grants federal courts jurisdiction to remedy 'structural' defects in pension plans established pursuant to § 302(c)(5)." Rather than attempt to define what is meant by the term "structural defect," most courts considering the issue have found it prudent to determine the issue on a case by case basis. *See, e.g., id.; Riley v. MEBA Pension Trust*, 570 F.2d 406 (2d Cir.1977); *Lugo v. Employees Retirement Fund of the Illumination Products Industry*, 529 F.2d 251 (2d Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *Mosley v. National Maritime Union Pension & Welfare Plan*, 438 F.Supp. 413 (E.D.N.Y. 1977). *Cf. Haley v. Palatnik*, 509 F.2d 1038 (2d Cir.1975) (decided under section 302(c)(6)). Even the First Circuit's definition in *Bowers v. Ulpiano Casal, Inc.*, 393 F.2d 421, 424 n. 4 (1st Cir.1968), is little more than a laundry list of potential deviations from the requirements of section 302(c).

■ We acknowledge that on past occasions we have adopted a "narrow view" of

the scope of jurisdiction under section 302(e). *See, e.g., Riley v. MEBA Pension Trust*, 570 F.2d at 412 (rejecting "the notion that § 302(c)(5) [and § 302(e)] gave the federal courts a roving jurisdiction over ... the structure of pension plans"); *Lugo v. Employees Retirement Fund of the Illuminated Products Industry*, 529 F.2d at 255. Nevertheless, a finding of jurisdiction in this case is not contrary to that position. In fact, such a finding is entirely consistent with the mandate that we remedy structural defects. As the Third Circuit observed in *Knauss v. Gorman*, 583 F.2d 82, 85 (3d Cir.1978) (quoting *Associated Contractors v. Laborers International Union*, 559 F.2d 222, 225 (3d Cir.1977)),

> "[T]his much is certain: a federal court does have jurisdiction under [section 302(e)] to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception."

■ Local 50 argues that the retention by its health benefits fund of Entenmann's contributions was not a structural violation of section 302(c)(5), but simply a discretionary administrative decision made by its fund's trustees. We disagree. Section 302(c)(5) permits payments by an employer to the representative of its employees only "with respect to money or other thing of value paid to a trust fund established by such representative, *for the sole and exclusive benefit of the employees of such employer*, and their families and dependents ...." LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5) (emphasis supplied). The structural defect in this case is that absent the transfer of an aliquot share of reserves to Local 3 the past contributions made to Local 50 by Entenmann's will no longer inure to the "sole and exclusive benefit" of its employees. Clearly, this result does not stem from a discretionary trustee decision. It comes from the *absence* of any provision in the instruments of trust requiring a transfer of funds in cases where there is an employee change to a different bargaining

representative. Stated another way, Local 50 Fund's retention of Entenmann's contributions and hence the violation of section 302(c)(5)'s "sole and exclusive benefit" provision is one that is built into the trust. Inherent defects such as this, which go to the very essence of the fund, must be deemed "structural."

Case law supports this conclusion. In *Alvares v. Erickson*, 514 F.2d 156 (9th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), the Ninth Circuit premised section 302(e) jurisdiction on facts similar to those here. *Alvares* involved the withdrawal by members of one union local from a statewide bargaining unit composed of numerous locals. The withdrawing local then entered a new collective bargaining agreement with area employers and established its own health and welfare trust, to which those employers would make contributions on behalf of their employees. When the trustees of this new fund demanded from the state welfare trust an aliquot share of reserves—*i.e.*, that portion of the trust corpus representing its share of contributions previously made on behalf of the withdrawing members—the state trustees refused. *Id.* at 159. Following the statutory interpretation advanced by this Court in *Lugo, supra*, the Ninth Circuit held that a structural deficiency in the state trust fund, not a mere administrative decision, caused this violation of the "sole and exclusive benefit" provision. *Id.* at 165–66. *See also Raymond v. Hoffmann*, 284 F.Supp. 596 (E.D. Pa.1966) (finding jurisdiction where trustees of predecessor fund refused to turn over aliquot portion of reserves to fund established by successor union).

In light of these decisions as well as the notion that deviation from the requirements of section 302(c)(5) will cause a trust fund such as Local 50's to be structurally deficient, we affirm the district court's finding of federal subject matter jurisdiction.

### B. *Merits*

Although care must be taken not to confuse the jurisdictional question with consid-

eration of the merits, there is a considerable overlap between the two. As just noted, federal courts have authority to remedy structural defects in employee welfare trusts. Therefore, the inquiry now becomes whether Local 3's allegations of a structural defect are borne out by the facts and, if so, how it can be remedied.

Appellants make several arguments as to why Local 50 is entitled to retain the reserves attributable to Entenmann's contributions. First, they contend that the trust is not structurally defective. Next, appellants argue that section 302(e) limits the district court's jurisdiction to enjoining those criminal acts set forth in sections 302(a) and (b). Finally, they suggest that the Supreme Court's recent decision in *United Mine Workers of America Health & Retirement Funds v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), mandates reversal of the district court's judgment.

### 1. *Structural Defect*

■ In response to the assertion that its failure to transfer its aliquot portion of its reserves to the Local 3 Fund is structural rather than administrative, Local 50 answers that section 302(c)(5) requires only that trust funds be "established"—not perpetuated—for the sole and exclusive benefit of the employees of the contributing employer. *See Fiorelli v. Kelewer*, 339 F.Supp. 796 (E.D.Pa.1972), *aff'd mem.*, 474 F.2d 1340 (3d Cir.1973). While the statute actually employs the word "established," appellants' reading of its purport still misses the point.

The district court's opinion recites a statement by Senator Ball that bears repeating since he was one of the sponsors of LMRA section 302: "[A]ll [section 302] really does is to protect the rights of employees to benefits out of these funds which are created by their own labor." 93 Cong. Rec. 5147 (1947), *reprinted in 2 Legislative History of the Labor Management Relations Act, 1947,* at 1498 (1948). This comment lends support to a view that it was Congress' aim that structural defects be remedied by the courts regardless of

when they arise. That salutary purpose of protecting employees' rights to trust fund benefits amounts to little more than empty rhetoric under Local 50's view.

In addition to legislative history, decisional law embraces this concept. For example, the Ninth Circuit in *Alvares v. Erickson, supra,* observed that "[t]he structural deficiency test does not depend solely on the structure of the trust fund at its inception." 514 F.2d at 165. *Alvares*, in turn, quoted extensively from *Porter v. Teamsters Health, Welfare and Life Insurance Funds of Philadelphia,* 321 F.Supp. 101, 103–04 (E.D.Pa.1970), which said:

> [T]he claims relating to structural violations need not be directed to the point in time when the trust funds were created and the first contributions made. To so hold would create grave practical problems .... If at some future point during the trust fund's existence it were either amended or administered in such a way as not to comply with those provisions [of section 302(c)(5)], such would be a structural violation ....

Finally, even accepting appellants' overly literal reading of section 302(c)(5), we still would find that the structural defect—*i.e.,* the lack of a provision requiring transfer of funds in circumstances such as these—existed at the time the Local 50 Fund was "established," though it did not become apparent until Entenmann's workers switched their union allegiance.

### 2. *Enjoining of Criminal Acts*

■ Appellants' second argument, that the district court's authority under LMRA section 302 is limited to the enjoining of criminal acts, find little, if any, support in precedent. As already discussed, federal courts have authority in non-criminal settings to remedy structural defects in pension plans established pursuant to section 302(c)(5). *Valle v. Joint Plumbing Industry Board,* 623 F.2d at 201 n. 8. Even the cases upon which appellants principally rely support this proposition. *See, e.g., Riley v. MEBA Pension Trust,* 570 F.2d at 412–13; *Lugo v. Employees Retirement*

*Fund of the Illumination Products Industry,* 529 F.2d at 254–55.

Section 302 plainly has application to criminal activities, most importantly "to deter and punish the bribery of employee representatives by employers and the extortion of employers by employee representatives." *United States v. Cody,* 722 F.2d 1052, 1058 (2d Cir.1983) (citing *Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915 (1959)). An exception to the general proscription against employer payments to union officials is permitted under § 302(c), but only when the payments inure to "the sole and exclusive benefit of the employees of such employer." Although as applied to the facts of the instant case, this proviso may not have a direct impact on bribery and extortion, it clearly furthers other beneficial policies such as an employee's freedom to choose the collective bargaining representative he wants. *See* Section II *supra.*

Accordingly, jurisdiction under LMRA section 302(e) is not limited to the enjoining of criminal acts; the policies implicated in its "sole and exclusive benefit" provision are themselves worthy of protection.

### 3. *The* Robinson *Decision*

Perhaps appellants' most novel argument relies on the Supreme Court's recent decision in *United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), which held that section 302(c)(5) does not impose a reasonableness requirement on welfare plan provisions established by collective bargaining agreement. *Robinson* dealt with provisions of an employees' trust fund that awarded greater benefits to widows of coal miners who were receiving pensions when they died than to widows of coal miners who, although eligible for pensions, were still working when they died. *Id.* at 563, 102 S.Ct. at 1228. The District of Columbia Circuit Court of Appeals had found this discriminatory practice violative of section 302(c)(5)'s "sole and exclusive benefit" provision. *Robinson v. United Mine Workers of America Health and Retirement Funds,* 640 F.2d 416, 421–23 (D.C.Cir.1981).

A unanimous Supreme Court promptly reversed, holding that section 302(c)(5) does not authorize federal courts to review the reasonableness of provisions in a collective bargaining agreement allocating health benefits among potential beneficiaries of an employee trust fund. 455 U.S. at 574, 102 S.Ct. at 1233. Nonetheless, the Court explicitly left open the question of whether federal courts of equity may enforce a trustees' traditional fiduciary duties. *Id.* at 573 n. 12, 102 S.Ct. at 1233 n. 12. Moreover, under the facts of *Robinson* the money retained by the trust fund redounded to the "sole and exclusive benefit" of each contributing employer's employees.

The present case is readily distinguishable. Local 50's failure to transfer the portion of its reserves attributable to Entenmann's does not mean that those funds will benefit some Entenmann's employees more than others—*i.e.,* the *Robinson* scenario—but that *none* of Entenmann's employees will benefit at all from Entenmann's contributions. While the collective bargaining provisions in *Robinson* did not violate the letter of the "sole and exclusive benefit" requirement, the Local 50 Fund provisions in this case surely would if we were to adopt appellants' position. Therefore, *Robinson* is inapposite and appellants' reliance on it is misplaced.

### IV  *LOCAL 50 FUND'S CLAIMS*

Respecting its original claims, the Local 50 Fund's primary argument on appeal is that a factual dispute existed concerning the interpretation and application of the collective bargaining and trust agreements and, consequently, that summary judgment was inappropriate. *See* Fed.R.Civ.P. 56(c). This is a somewhat anomalous position in light of Local 50's earlier admission—in an affidavit opposing Local 3's motion for summary judgment and supporting its own cross-motion for summary judgment—that the *only* fact in dispute pertained to the amount of reserves claimed as attributable to Entenmann's. Thus, we agree with the district court's finding that the facts are

not in dispute, 561 F.Supp. at 207, and thus proceed to examine the legal merits of appellants' claims.

■ Local 50 takes the position that because Local 3 represented Entenmann's employees as of September 1, 1979 Local 3 should have paid the insurance premiums due on that date. In addition, Local 50 contends that since each contribution by Entenmann's was derived from the number of hours worked by its employees during the preceding month, the September 15 contribution should have been paid to the trust fund of the local that represented those employees during August—i.e., Local 50. Under its theory, employer contributions would be "retrospective" and insurance premium payments "prospective."

The district court rejected the Local 50 Fund's position. Instead, it noted that mere calculation of employer contributions based on the number of hours worked in a given month does not necessarily mean those payments constitute reimbursement for insurance payments made during that month. Moreover, the trial court observed that although the relevant insurance policy required Local 50 to pay premiums before its members would receive benefits, those premiums are not necessarily prospective vis-a-vis welfare fund contributions. 561 F.Supp. at 208. According to the undisputed facts, Entenmann's made two monthly contributions to the Local 50 Fund and owed an additional month's accrued obligations before Local 50 began to pay insurance premiums on behalf of Entenmann's employees. Such action is consistent not only with the provisions of the collective bargaining agreement and group insurance plan, but also with the common sense expectation that a fund must build its re-

serves before paying insurance premiums. *See id.*

Thus, the Local 50 Fund had built its reserves prior to and throughout the period in which it represented Entenmann's employees. From these reserves, the Local 50 Fund paid the September 1 premium. The district court took this into account when it computed the amount of Local 50's reserves that had to be transferred to the Local 3 Fund on its counterclaim. In particular, the September 1 premium payment reduced the Local 50 Fund's total reserves as of the date set for transfer. A reduction of total reserves, in turn, caused a reduction of the reserves attributable to Entenmann's. We therefore agree with the district court's reasoning and application insofar as it summarily dismissed appellant's claim for reimbursement of the September 1 premium payment.

■ The issue of Entenmann's September 15 contribution to Local 3 presents a different problem. On its face, the district court's conclusion that employer contributions are prospective vis-a-vis insurance premium payments is appealing; however, we reject this theory in favor of the view that contributions and premiums stand on separate footings. The employer contributions made by Entenmann's to Local 50 were in lieu of wages, and since the contribution made on the 15th of the month were based on the number of employee work hours from the preceding month, logic suggests that the September 15 contribution was made in lieu of wages for work performed in August. Clearly, if the number of hours worked and the corresponding contribution could have been calculated and paid immediately on August 31, no one would disagree that the contribution should have been paid to the representative as of August 31, the Local 50 Fund.[1]

1. The district court attempted to bolster its theory by citing various clauses contained in the collective bargaining agreements. *See* 561 F.Supp. at 208–09. These references may support the finding that Local 50 must pay the September 1 premium, but they do not have any bearing on the September 15 employer contribution. Especially puzzling is the notion that a subsequent collective bargaining agreement be-

tween Entenmann's and Local 3 can relieve Entenmann's of its existing obligations to Local 50. In any event, since we require Local 50 to transfer to Local 3 all accumulated reserves attributable to Entenmann's, the contribution will ultimately inure to the benefit of Entenmann's employees, just as the collective bargaining agreement and the statute require.

For administrative reasons there is a necessary delay between the end of a work period and the date when the payment is forwarded. Time is needed for Entenmann's to compute its employee's work hours, make its computations and arrange for payment. Thus, we see no reason to penalize the Local 50 Fund merely because the collective bargaining agreement granted the employer two weeks grace each month before its previously accrued obligation was to be paid.

## V  CALCULATION OF RELIEF

We need not respond in detail to appellants' contention that the district court's calculation of reserves attributable to Entenmann's is flawed. In arriving at his ultimate figure, Judge Platt took great pains to minimize error and, in every instance, his interpretation favored the Local 50 Fund. *See* 561 F.Supp. at 217–21. Equally important is the fact that appellants, in opposing a summary judgment based on appellees' formula, were required to do more than just hint at the existence of an alternative. Yet they offered no alternative to the formula proposed by Local 3 or to the one ultimately used by the district court. These omissions preclude appellants from raising factual allegations on appeal. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). In any event, no material issues of fact remain unsettled.

The only adjustment is a revision of the district court's computation to take into account the September 15 employer contribution. Since we require the Local 3 Fund to pay to the Local 50 Fund that $151,-837.58, the Local 50 Fund's reserves will be increased by that amount. Accordingly, the figures will be as follows:

| | | |
|---|---|---|
| (1) | $3,602,253 | Local 50 Fund Reserves as of Oct. 1, 1979 |
| (2) | – 811,044 | Local 50 Fund Reserves as of March 1, 1970 |
| (3) | $2,791,209 | Increase in Local 50 Fund Reserves for the period during which Entenmann's made contributions |
| (4) | X     .174 | Average Ratio of Entenmann's Contributions to Total Contributions |
| (5) | $  485,670. | Local 50 Fund Reserves Attributable to Entenmann's |

This amount exceeds the district court's award on the counterclaim by $26,419.

## VI  CONCLUSION

As a final note, it is appropriate to signal our approval of the district court's requirement that the post-transfer position of the successor fund's members may not be better than their pre-transfer position. This stipulation should assure that bargaining representatives will not use today's holding as a tool with which to lure groups of employees from their current representatives.

In accordance with this opinion, the judgment of the district court is affirmed in part and reversed in part. The calculation of relief is hereby modified so that the Local 3 Fund shall pay to the Local 50 Fund $151,837.58 representing the September 15 contribution, and the Local 50 Fund shall transfer to the Local 3 Fund $485,670 on the counterclaim plus pre-judgment interest in an amount to be determined by the district court on remand.[2]

---

**2.** The district court originally awarded Local 3 $246,532.27 in pre-judgment interest on its counterclaim award of $459,251. Since we have modified the judgment on Local 3's counterclaim, the district court should modify accordingly its calculation of pre-judgment interest.

In doing so, the district court should also take into account the fact that Local 3 has, since September 15, 1979, held $151,837.58 that rightfully belonged to Local 50. We see no reason why Local 50 should not receive pre-judgment interest on that amount.