Walter **DUDO**

v.

**Charles J. SCHAFFER, Jr., Richard W. Cutaiar, William Lemon, Vincent Dagen, Maurice R. Schurr, William J. Gormley, Joseph Cimino, Teamsters Pension Trust Fund of Philadelphia and Vicinity, Highway Truck Drivers & Helpers Local No. 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America**[1].

**Civ. A. No. 78–467.**

United States District Court, E.D. Pennsylvania.

Dec. 1, 1982.

---

1. On August 10, 1981, summary judgment was entered in favor of Highway Truck Drivers & Helpers Local No. 107.

Lewis Kates, Philadelphia, Pa., for plaintiff.

Nicholas N. Price, James J. Leyden, Philadelphia, Pa., for defendants.

SUR PLEADINGS AND PROOF

LUONGO, Chief Judge.

This is an action brought under § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). Plaintiff, Walter Dudo, is a former member of the Highway Truck Drivers and Helpers Union, Local 107 of the International Brotherhood of Teamsters (Local 107). He was denied pension benefits from the Teamsters Pension Trust Fund of Philadelphia and Vicinity on the ground that he had a break in service with employers participating in the union pension plan. Dudo claims that the

break-in-service rule constitutes a structural defect in the pension plan in that it arbitrarily excludes employees from benefits. By way of relief, Dudo seeks to enjoin defendants from applying the break-in-service rule.

Following the completion of a non-jury trial held on October 21–22, 1982, the parties submitted requests for findings of fact and conclusions of law. On pleadings, proof, and the written submissions of the parties, I make the following

## FINDINGS OF FACT

### The Parties

1. Plaintiff, Walter Dudo, is a former member of the Highway Truck Drivers and Helpers Union, Local No. 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. (P–4, pp. 5–7).

2. Defendant Teamsters Pension Trust Fund of Philadelphia and Vicinity (the Fund) was established by agreement and declaration of trust dated December 30, 1957. (P–8, ¶ 3).

3. Defendant Charles J. Schaffer, Jr. is the administrator of the Fund. (P–8, ¶ 1).

4. Defendants William Lemon, Vincent Dagen, Maurice R. Schurr, William J. Gormley and Joseph Cimino are Trustees of the Fund. Defendant Richard Cutaiar ceased to be an employer-designated Trustee of the Fund as of January 31, 1978. (P–8, ¶ 2).

5. Defendant Highway Truck Drivers and Helpers Union, Local No. 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 107) is a labor union with its office at 107 Spring Garden Street, Philadelphia, Pennsylvania. Local 107 is subject to the constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters). (P–8, ¶ 4).

### The Fund and The Plan

6. The Fund was established pursuant to § 302(c)(5) of the Labor Management Rela-

tions Act (LMRA), 29 U.S.C. § 186(c)(5), to administer the Teamsters Pension Plan of Philadelphia and Vicinity (the Plan).

7. The agreement and declaration of trust, as amended, provides that the Fund and the Plan shall be administered and operated by six trustees (three union-designated trustees and three employer-designated trustees). (Answer of the Fund, Exh. 1).

8. Under the agreement and declaration of trust establishing the Fund, the Trustees are empowered, *inter alia:*

\*  \*  \*  \*  \*  \*

(b) To formulate, adopt, amend and administer a PENSION PLAN for the benefit of covered and eligible employes in order to provide retirement benefits for such employes;

(c) In connection with the administration and operation of the PENSION PLAN and in order to effectuate the purpose thereof, to formulate and establish the conditions of eligibility with respect to age and length of service; to formulate provisions for the amount and payment of benefits; . . .

\*  \*  \*  \*  \*  \*

(Answer of the Fund, Exh. 1, article IV).

9. The Fund is funded by employer contributions in amounts fixed by collective bargaining. (*Id.,* article VI).

10. Under the Plan formulated by the Trustees, an individual is automatically a Plan member if:

(a) he or she is an active employee in a collective bargaining unit represented by a union that is a party to the Fund; and

(b) contributions to the Fund are made by the employer on the employee's behalf. (P–6, Part I, at p. 7).

11. Local 107 is a party to the Fund. (P–2, article I, section E).

12. Eligibility for retirement benefits under the Plan is defined in terms of: (1) age; (2) number of "covered days" of contributions paid into the Fund on a member's behalf by a "covered employer"; and (3)

years of "continuous service." [2] (See id., article II).

13. A "covered employer" is defined to mean an employer who is obligated to make contributions to the Fund in accordance with the provisions of a collective bargaining agreement. (Id., article I, section G).

14. A "covered day" is defined to mean a day of employment of an employee with respect to which an employer contribution is paid on the employee's behalf into the Fund. A year of covered service is credited to the employee if 175 covered days are accumulated in a calendar year, and a half-year if more than 100 but less than 175 covered days are accumulated. (Id., article I, sections N & S).

15. "Continuous service" is defined by the Plan as the sum of "continuous past employment" and "continuous covered employment".

(a) As it pertains to this action, "continuous past employment" means employment in the industry prior to March 1, 1957 (i.e., before covered employers began making contributions to the Fund).

(b) "Continuous covered employment" means the number of completed covered years and half-years accumulated since the later of the employee's (i) first covered day, or (ii) most recent "break in service." (Id., article I, sections O–Q).

16. The break-in-service rule in effect when Dudo applied for retirement benefits provided that an employee was considered to have a break in service if he or she was not in covered employment (i.e., no contributions were made to the Fund on the employee's behalf) for a period of 156 consecutive calendar weeks (hereinafter referred to as the "3-year break-in-service rule"). (Id., article I, section R).

17. The consequence of a break in service was a loss of all continuous service credit earned prior to the break. (P–6, Part II, at p. 16).

18. An employee is considered to be in covered employment (hence no time toward break in service is counted) during the period the employee is a union officer or in the armed forces. (P–2, article I, sections G & R).

19. Break-in-service time is computed during the period an employee is on strike, self-employed, unemployed, in a supervisory position, or otherwise not covered by a collective bargaining agreement which obligates his employer to make contributions to the Fund on his behalf. (Testimony of C. Schaffer).

20. Article V, section A of the Plan provides, in part:

> It is hereby declared as the policy of the Trustees that consideration will be given in any individual case or cases to extenuating circumstances not recited above; such as strikes, lockouts, reduced business activity, etc., for the purpose of liberalizing the conditions which must be met by individuals in order to have their Continuous Service remain unbroken or to be considered as in retirement from Covered Employment, or to be considered as disabled. Any such liberalization shall be on a basis uniformly applicable to all individuals similarly situated.

Except in the case of total disability, the break-in-service rule has never been liberalized by the Trustees to account for extenuating circumstances. (Testimony of C. Schaffer).

21. An employee is eligible for normal retirement benefits once he or she reaches 57 years of age and completes 20 years of continuous service.[3] (P–2, article II, section A).

---

**2.** The eligibility rules outlined in Findings 12–22 pertain to service earned prior to January 1, 1976, when the Plan was amended prospectively to comply with the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. Since Dudo earned no service credit after 1975, the liberalization of eligibility rules effected by the 1976 amendments has no bear-

ing on Dudo's right to retirement benefits, except insofar as it may have been arbitrary and capricious for the Trustees not to have made the new rules apply retroactively. See discussion infra.

**3.** The eligibility requirements are actually more complex than outlined here, but it is unnecessary to detail those requirements since it is

22. An employee is eligible for early retirement benefits once he or she either (a) completes 30 years of continuous service or (b) reaches 50 years of age and completes 20 years of continuous service.[4] (*Id.*, article II, section B).

### Dudo's Employment History

23. Walter Dudo was born on March 29, 1917, and received no more than a sixth-grade education. (P–4, pp. 10–11).

24. In 1940, Dudo began driving for Local 107. Since the "union books were frozen," Dudo did not become a member of Local 107 until 1945. (*Id.*, pp. 6–7).

25. On March 1, 1957, when the Plan became operative, Dudo became a member of the Plan and was credited with 16 years of past continuous employment. (*See* P–1).

26. From March 1, 1957, until he suffered a work-related injury to his back in July 1960, Dudo was in covered employment with Elliott Brothers Trucking Company. (P–4, at p. 12; D–21).

27. As a result of the work-related injury to his back, Dudo received workers' compensation for approximately five months. (P–4, at p. 12).

28. In or about December 1960, Dudo attempted to return to work with Elliott Brothers, but could not perform the lifting and bending required for the job. (*Id.*).

29. As of the end of calendar year 1960, Dudo was credited with 16 years of past continuous employment (Finding 25) plus 3.5 years of continuous covered employment (Finding 26) for a total of 19.5 years of continuous employment. (P–1).

30. Shortly after returning to work following his back injury, Dudo inquired of Local 107 officials about the availability of "over-the-road" work and was told that none was available.[5] (P–4, pp. 36–37 & 42).

31. Although Dudo did not work in covered employment in 1961, he did work 3 days in covered employment in the first quarter of 1962. (P–1; D–21).

32. From the first quarter of 1962, until the fourth quarter of 1966, Dudo did not work a single day in covered employment, a hiatus of over four years. Thus, under the 3-year break-in-service rule, Dudo had suffered a break in service and lost all credit for the 19.5 years of continuous service earned previous to the break. (P–1).

33. In 1964, Dudo again inquired of Local 107 officials about the availability of road work, and was again told that none was available. (P–4, pp. 16–17).

34. Unsuccessful in obtaining road work, Dudo accepted employment with Charles Benjamin, Inc. as a watchman, a position which he held from 1964 until 1967. (*Id.* at pp. 17, 30–36; D–21). Dudo's position as a watchman was not covered by collective bargaining. Hence, no contributions to the Fund were made on his behalf. (Testimony of Sidney Benjamin).

35. Although Dudo believed that Charles Benjamin, Inc. was making contributions to the Fund on his behalf, no one from either the Fund or Local 107 contributed to that misconception. (P–4, pp. 17, 34–45).

36. Dudo's break in service was not involuntary or otherwise due to circumstances beyond his control.

37. From the time Dudo returned to covered employment in 1966 until his retirement in 1975, Dudo accumulated 2 years of continuous service credit.

38. On July 22, 1971, Dudo applied to the Fund for retirement benefits. Because of his break in service, Dudo's application for benefits was denied. (P–8, ¶ 8; D–19).

39. Had Dudo not suffered the break in service, he would have been eligible for early retirement benefits on March 29, 1967, the date of his 50th birthday. (P–8, ¶ 27).

---

undisputed that Dudo satisfied all but the continuous service requirement.

4. *See* note 2 *supra.*

5. Unlike the "local driving" that Dudo had been doing prior to his injury, "road work" did not involve substantial lifting and bending.

40. On April 14, 1976, Dudo again applied for retirement benefits. His application was again denied because of his break in service. (*Id.*, ¶ 9; D–20).

41. Had Dudo not suffered the break in service, he would have been eligible for normal retirement on or after March 29, 1974, the date of his 57th birthday. (P–8, ¶ 26).

### Evolution of the Break-in-Service Rule

42. Under the Plan as originally formulated in 1957, a break in service was considered to have occurred if a member worked fewer than 200 covered days in a period of two consecutive calendar years. (P–5, article I, section R).

43. The original break-in-service rule had been adopted by the Trustees on the advice of the Fund's actuary who helped draft the provision. (Testimony of C. Schaffer).

44. Since the Fund is required to record a contingent liability for each active Plan member, the break-in-service rule enabled the Trustees to more easily determine the number of active members and hence reduce the cost of the Plan. (Testimony of S. Kurash).

45. In 1963, the Trustees amended the break-in-service rule to provide that a break in service was considered to have occurred if a member were not in covered employment (*i.e.*, no contributions were made to the Fund on the employee's behalf) for a period of 104 consecutive calendar weeks (hereinafter referred to as "the 2-year break-in-service rule"). (D–4).

46. In 1966, the Trustees began considering whether to enter into a reciprocal agreement with other Teamsters pension funds. The purpose of these proposed agreements was to provide pro rata pensions to employees who otherwise would be ineligible for retirement benefits because their years of covered employment had been divided between employers who contributed to two or more pension funds. (D–9; Testimony of C. Schaffer).

47. Among the many proposals considered by the Trustees was a reciprocal agreement, prepared by the International union, which contained a 5-year break-in-service provision. The Trustees were especially concerned about the actuarial implications of becoming a signatory to an agreement which would entail a substantial amendment to the Plan and its then existing 2-year break-in-service rule. (*Id.*)

48. In 1968, after months of study, the Trustees accepted the recommendation of the Fund's actuary and rejected the reciprocal agreement proposed by the International because the agreement's 5-year break-in-service provision was unacceptable. (D–8; D–9; Testimony of C. Schaffer).

49. Although the Trustees could not accept a 5-year break-in-service provision, they did consider other possible liberalizations of the rule. Specifically, in June 1968, they requested the Fund's actuary to study the cost to the Fund of a "graduated break-in-service provision" that would provide as follows:

| Credited service in plan at time break occurs | Period of non-covered employment which will cause a break in service |
| --- | --- |
| 5 years or less | 2 years |
| more than 5 but less than 10 yrs. | 3 years |
| 10 but less than 15 yrs. | 4 years |
| 15 but less than 20 yrs. | 5 years |
| 20 years or more | unlimited |

(D–11).

50. In August 1968, the actuary reported to the Trustees that adoption of the graduated break-in-service provision would result in a 2–3 percent increase in the cost of the Plan, or roughly $200,000–$300,000. (D–16; Testimony of R. Smith).

51. The actuary recommended that the Trustees not approve the graduated break-in-service provision because: (a) employer contributions were barely adequate to cover the normal cost of the Plan, and (b) legislation was pending in Congress which would significantly increase the cost of funding the Plan.[6] The Trustees accepted the actu-

---

**6.** In 1968, the Trustees were paying interest only on the past service cost of the Plan (*i.e.*, the cost of providing benefits for service before 1957 when employers began contributing to the

ary's recommendation and did not approve the proposed graduated break-in-service provision. (D–13 to D–17; Testimony of R. Smith).

52. Although the Trustees rejected the graduated provision, they did agree to a minimal liberalization of the 2-year break-in-service provision then in effect. (*See* Finding 41). On December 10, 1968, the Trustees amended the Plan, retroactive to April 1, 1968, by adopting the 3-year break-in-service rule set forth in Finding 16. (D–5; Testimony of C. Schaffer).

53. The 3-year provision was in effect on the two occasions Dudo applied for benefits, and remained in effect until the Plan was amended in 1976 to comply with ERISA.

54. In 1976, the Plan was again amended, retroactive to January 1, 1976, to bring it into compliance with ERISA. The amended Plan provided that the 3-year break-in-service rule would remain in effect for all breaks in service occurring before January 1, 1976, the effective date of ERISA. (P–3, article I, section N). For breaks in service occurring after December 31, 1975, the amended Plan provided that a break in service would result

if, prior to the time he has completed 10 years of service, ..., [the employee] has a One Year Interruption of Service and the number of consecutive One Year Interruptions of Service equals or exceeds the number of years of service credited to him after the last preceding Break in Service....

(*Id.,* article I, section Q.)

55. At the time the Plan was amended in 1976, employer contributions were inadequate to meet the annual cost of the Plan under the new vesting and minimum funding requirements wrought by ERISA. Hence, since contributions were inadequate to maintain the Plan prospectively, the Trustees did not study the cost of making the Plan amendments apply to service and breaks in service occurring before January 1, 1976. (Testimony of R. Smith).

56. As of 1979, the number of persons denied benefits due to a break in service was as follows:

(a) 148 persons denied normal retirement benefits;

(b) 29 persons denied disability retirement benefits;

(c) 39 persons denied early retirement benefits.

(P–8, ¶¶ 20 & 23–24).

57. As of January 1, 1982, the Plan was not in excellent financial health. Projected Plan contributions for 1982 were insufficient to cover the annual 30-year funding cost of the Plan, and the actuarial value of the Plan's assets represented only 30.9% of the value of accumulated Plan benefits. (D–27; D–28; Testimony of S. Kurash).

## DISCUSSION

Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, makes it unlawful for employers to make payments to unions. Excepted from the general prohibition of § 302 are payments "to a trust fund established ... for the sole and exclusive benefit of the employees of such employer." LMRA, § 302(c)(5), 29 U.S.C. § 186(c)(5).

Plaintiff brought this action under § 302(e) of the Act which confers jurisdiction on federal district courts to restrain violations of § 302. Plaintiff maintains that the Fund does not operate "for the sole and exclusive benefit of employees" because the Plan contains certain structural deficiencies which operate arbitrarily to exclude employees from receiving retirement benefits. Essentially, Dudo makes two arguments. First, he contends that the 1976 Plan operates arbitrarily and capriciously in that it distinguishes between an employee who has a lapse in covered employment before January 1, 1976, and an employee who has a similar lapse subsequent to that date. Second, Dudo argues that the break-

Fund). Under the legislation pending in Congress, the Trustees would be required to amortize this past service cost over a 30 or 40 year

period. Such amortization is now required by ERISA. (*See* 29 U.S.C. § 1082).

in-service rule operates arbitrarily to divest the benefits of an employee who suffers an involuntary break in service.

### Jurisdiction

■ Defendants initially challenge the subject matter jurisdiction of the court to review the reasonableness of the Plan eligibility requirements. As I adverted to at the outset of this discussion, § 302(e) of the LMRA confers jurisdiction to restrain violations of § 302. Until recently, it had been well-settled in this and other circuits that "a federal court does have jurisdiction under [§ 302(e)] to enforce a trust fund's compliance with the statutory standards set forth in subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception." *Associated Contractors v. Laborers International Union,* 559 F.2d 222, 225 (3d Cir.1977); *see Johnson v. Botica,* 537 F.2d 930 (7th Cir. 1976); *Alvares v. Erickson,* 514 F.2d 156 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975); *Kosty v. Lewis,* 115 U.S.App.D.C. 343, 319 F.2d 744 (1963), *cert. denied,* 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). Furthermore, because § 302(c)(5) has been interpreted as imposing traditional fiduciary duties on fund trustees, *see Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), the courts of appeals had recognized uniformly that the jurisdictional reach of § 302(e) also encompasses actions to enforce these fiduciary obligations to ensure that trustees do not act arbitrarily and capriciously toward intended trust beneficiaries. *Knauss v. Gorman,* 583 F.2d 82, 87–88 (3d Cir.1978); *Riley v. MEBA Pension Trust,* 570 F.2d 406, 412 (2d Cir.1977); *Roark v. Lewis,* 130 U.S.App.D.C. 360, 401 F.2d 425 (1968).

The vitality of these precedents on the jurisdictional issue, however, is not so certain following the decision last term of the United States Supreme Court in *United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). In *Robinson,* the Court held that § 302(c)(5) does not authorize federal courts to review for reasonableness the provisions of a collective bargaining agreement which fix eligibility rules for an employee benefit trust fund. The Court reasoned that not only does the statutory language of § 302(c)(5) not embody a reasonableness requirement, but also that no such requirement could be discerned from the statute's legislative history:

> The section was meant to protect employees from the risk that funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders. Proponents of this section were concerned that pension funds administered entirely by the union leadership might serve as "war chests" to support union programs or political factions, or might become vehicles through which "racketeers" accepted bribes or extorted money from employers.

> Our interpretation of the purpose of the "sole and exclusive benefit" requirement is reinforced by the other requirements of § 302(c)(5). Section 302(c)(5) is an exception in a criminal statute that broadly prohibits employers from making direct or indirect payments to unions or union officials. Each of the specific conditions that must be satisfied to exempt employer contributions to pension funds from the criminal sanction is consistent with the nondiversion purpose. The fund must be established "for the sole and exclusive benefit" of employees and their families and dependents; contributions must be held in trust for that purpose and must be used exclusively for health, retirement, death, disability, or unemployment benefits; the basis for paying benefits must be specified in a written agreement; and the fund must be jointly administered by representatives of management and labor. All the conditions in the section fortify the basic requirement that employer contributions be administered for the sole and exclusive benefit of employees. None of the conditions places

any restriction on the allocation of the funds among the persons protected by § 302(c)(5).

102 S.Ct. at 1232.

Defendants concede that unlike in *Robinson,* the eligibility rules in dispute here were not the product of collective bargaining but rather were adopted by the Trustees. Nevertheless, defendants contend that this is a meaningless difference.

I disagree. The Court in *Robinson* found distinguishable those cases in which the lower courts had reviewed the reasonableness of trustee-enacted eligibility requirements. The Court then noted:

> In *NLRB v. Amax Coal Co.,* [453 U.S. 322, 330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981)], the Court held that in enacting § 302(c)(5) "Congress intended to impose on trustees traditional fiduciary duties." The Court did not decide, nor do we decide today, whether federal courts sitting as courts of equity are authorized to enforce those duties. It is, of course, clear that compliance with the specific standards of § 302(c)(5) in the administration of welfare funds is enforceable in federal district courts under § 302(e) of the LMRA. *See Arroyo v. United States,* 359 U.S. 419, 426–27 [79 S.Ct. at 868–69].

102 S.Ct. at 1232 n. 12.

While *Robinson* may not sound a ringing endorsement for the *Knauss v. Gorman* line of decisions, neither does it in my opinion undercut the vitality of those decisions. The *Robinson* Court expressly reaffirmed that § 302(c)(5) does impose fiduciary duties upon the trustees of employee benefit trust funds. *Id. See also NLRB v. Amax Coal Co.,* 453 U.S. 322, 332, 101 S.Ct. 2789, 2795, 69 L.Ed.2d 672 (1981). It would be anomalous indeed to conclude that the statute imposes fiduciary obligations but that federal courts are powerless to enforce them. *Accord Kozlesky v. Board of Trustees,* 546 F.Supp. 466, 468 n. 1 (E.D.Mich. 1982). Thus, I find it extremely significant that the eligibility requirements at issue in *Robinson* were fixed by collective bargaining and not by the trustees. Apart from the application of those eligibility require-

ments, the *Robinson* trustees exercised no discretion whatsoever. It follows, therefore, that any arbitrariness in the eligibility requirements could not possibly be attributed to the trustees. That is not the situation here. The defendant Trustees in this action, unlike their counterparts in *Robinson,* did possess full authority to fix eligibility rules. If, as Dudo alleges, their exercise of that authority led to the adoption of unreasonable eligibility requirements, I hold that this court does have jurisdiction to restrain the Trustees from further violating the fiduciary standards imposed by § 302(c)(5). Absent a more definitive pronouncement from the Supreme Court, I am of the opinion that *Knauss v. Gorman, supra,* remains good law.

### The Merits

In 1976, the Trustees amended the Plan retroactive to January 1, 1976 to bring it into compliance with the minimum vesting standards of ERISA. *See* 29 U.S.C. § 1053. For purposes of this action, only two of these amendments need be noted. First, to comply with § 203(a) of ERISA, 29 U.S.C. § 1053(a), the Plan was amended to provide for complete vesting of benefits upon the completion of ten years of continuous service. Second, to comply with § 203(b)(3)(D) of ERISA, 29 U.S.C. § 1053(b)(3)(D), the break-in-service rule was amended *to apply prospectively only* to provide that no employee with less than ten years of continuous service (*i.e.,* a non-vested employee) would suffer a break in service unless the number of consecutive years the employee absented himself from covered employment equaled or exceeded the number of years of service credited to him before he left covered employment. For example, under this so-called "rule of parity," an employee with six years of service credit would have to absent himself from covered employment for six or more consecutive years before all service credit earned prior to the break would be forfeited. This rule of parity, however, applied only to breaks in service occurring *after* January 1, 1976. The three-year break-in-service was retained for all

breaks in service which, like Dudo's, had run their course by January 1, 1976.

Dudo's initial argument is not that he had a vested right to retirement benefits under the terms of ERISA. He concedes that ERISA's minimum vesting standards did not become binding upon the Plan until after he had separated from service. Instead, Dudo's claim is that the Trustees violated § 302(c)(5) of the LMRA by making an arbitrary and capricious determination not to make the 1976 amendments to the Plan fully retroactive. According to Dudo, the dual break-in-service scheme created by the 1976 amendments is arbitrary in that the determination of whether an employee has suffered a break in service turns on whether the employee's interruption in covered employment occurs before or after January 1, 1976. Dudo further maintains that the Trustees have failed to meet the burden of demonstrating substantial justification for this dual break-in-service scheme because no actuarial study was ever undertaken by the Trustees to determine the cost to the Plan of applying the rule of parity retroactively.

The Trustees argue that the new break-in-service rule was adopted solely to comply with ERISA. Furthermore, they contend that it was not arbitrary to give only prospective effect to the rule of parity because under § 203(b)(1)(F) of ERISA, 29 U.S.C. § 1053(b)(1)(F), the employer is permitted, in applying the minimum vesting provisions, to disregard all years of service prior to January 1, 1976 "if such service would have been disregarded under the rules of the plan with regard to breaks in service as in effect [before January 1, 1976]." In other words, the Trustees assert that ERISA expressly permits the dual break-in-service scheme.

Dudo responds that ERISA does not place any imprimatur on the dual scheme in question here. His position is that ERISA's minimum vesting standards are exactly what they purport to be, statutory *minimums* only. There is nothing in ERISA, he maintains, which precludes the Trustees from doing more than ERISA requires, and

nothing within ERISA which shields arbitrary distinctions in employee benefit trust funds from scrutiny under § 302(c)(5) of the LMRA. The issue, therefore, in Dudo's view is whether the Trustees acted arbitrarily in "deciding" to do no more than ERISA required. Dudo contends that the dual break-in-service scheme is arbitrary on its face; hence, he would impose upon the Trustees the burden of demonstrating actuarial necessity for the scheme, a burden which he argues the Trustees have failed to meet.

I am unpersuaded by Dudo's argument that the dual break-in-service scheme is arbitrary and capricious. To be sure, ERISA does not necessarily insulate plans from scrutiny under § 302(c)(5) of the LMRA, *see Knauss v. Gorman,* 583 F.2d 82, 89 n. 26 (3d Cir.1978), but I cannot conclude that the scheme is irrational when the Congress that enacted ERISA expressly permitted prospective application of the rule of parity after carefully studying the entire subject of vesting of pension benefits. *See* H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 4689–90; H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5051–52. *See also Mosley v. Maritime Union Pension & Welfare Plan,* 438 F.Supp. 413, 421–22 (E.D. N.Y.1977).

It must be emphasized initially that ERISA's minimum vesting standards do apply retroactively to the extent that the Trustees are required, as a general rule, to include all service credit earned prior to the Act's effective date in determining whether an employee has become vested. The costs that would result to plans because of this requirement were not overlooked by the drafters of ERISA. Furthermore, they realized that the costs imposed by the minimum vesting standards would be greatest for plans which—like the one here—provided no vesting prior to retirement. H.R.Rep. No. 807, *supra.* To soften the blow, Congress took two basic steps. First, whereas many of ERISA's provisions became effective on January 1, 1975, *see, e.g.,* 29 U.S.C.

§§ 1031, 1114, the effective date of the minimum vesting standards was postponed until January 1, 1976 for plans in existence on January 1, 1974. H.R.Rep. No. 807, *supra; see* 29 U.S.C. § 1061. Second, and more importantly, "to keep the operation of the minimum vesting requirement reasonable and to avoid imposing undue burden on plans," Congress excepted certain periods of service from the general rule that all service, including pre-ERISA service, must be aggregated in determining whether vesting has occurred. H.R.Rep. No. 807, *supra; see* 29 U.S.C. § 1053(b). As ultimately enacted, seven specific exceptions were created, 29 U.S.C. § 1053(b)(1). For example, the plan is permitted to disregard "years of service before January 1, 1971, unless the employee has had at least 3 years of service after December 31, 1970." *Id.* § 1053(b)(1)(E). Another exception, under which defendants seek shelter, permits the plan to disregard years of service forfeited under a break-in-service rule in effect before the minimum vesting standards became effective. *Id.* § 1053(b)(1)(F). The sole other exception that need be mentioned is that which permits the disregard of service forfeited because of a break in service under the rule of parity that became effective on January 1, 1976 for plans in existence on January 1, 1974. *Id.* § 1053(b)(1)(D).

■ In sum, Congress did not think it irrational to require that the rule of parity be given prospective application only. Congress apparently reasoned that the burdens imposed by the minimum vesting standards were substantial enough without requiring plan administrators to restore the service credit of employees who previously suffered breaks in service. That reasoning is supported by the facts of this case. According to the uncontroverted testimony of the Fund's actuary, contribution levels in 1976 were insufficient at 1976 benefit levels to maintain the Plan in compliance with ERISA. In other words, the Trustees could not satisfy the minimum requirements of ERISA, let alone do more.[7] Dudo's attempt to impugn the actuarial evidence is feeble at best. He argues that the actuary never computed the cost to the Plan of applying the 1976 amendments retroactively. There is no logic in this argument. The rational individual who is struggling in vain to make installment payments on his used car does not undertake to calculate how much more indebted he would become by purchasing a Rolls Royce. I see no reason why the Fund's actuary should be expected to make an equally foolish computation. Accordingly, for all the reasons discussed above, I conclude that the dual break-in-service scheme created by the 1976 amendments to the Plan is not unreasonable.

Even if the non-retroactivity of the 1976 amendments is not unreasonable, Dudo argues that the three-year break-in-service rule is unreasonable in that it arbitrarily excludes from benefits those employees whose break in service is involuntary or induced by the improper conduct of a Trustee.[8] The argument is based upon the decision in *Knauss v. Gorman,* 583 F.2d 82 (3d Cir.1978). Since it is a decision of the Court of Appeals for the Third Circuit, *Knauss* merits closer examination.

The plaintiff in *Knauss* worked as a butcher for the same employer from 1936 until 1962 when his employer went bankrupt. Since 1957, the employer had contributed on Knauss' behalf to a multi-employer pension fund which, like the present Fund, credited members with full past service credit for years of service prior to the fund's 1957 inception date. After his employer ceased operating in 1962, Knauss

---

7. Admittedly, the minimum vesting standards were not solely responsible for the increased cost of maintaining the Plan. The minimum funding standards of ERISA, 29 U.S.C. § 1082, also contributed heavily to the increase in Plan costs. Nevertheless, in evaluating the rationality of the 1976 amendments to the Plan, the fact remains that the burdens imposed upon the Fund by ERISA were extensive.

8. That it is irrational to give prospective effect only to ERISA's rule of parity does not necessarily imply that break-in-service rules in effect prior to ERISA's effective date are likewise not irrational. ERISA places no seal of approval on pre-ERISA pension plans. *See Knauss v. Gorman,* 583 F.2d at 89 n. 26.

sought unsuccessfully to obtain covered employment before moving from Pittsburgh to the West Coast. After a four-year break in service, Knauss returned to Pittsburgh and to covered employment with another employer contributing to the fund. Knauss remained in that position until he was laid off in 1972. He then applied for pension benefits. While the plan at that time required only ten years of service, Knauss' application was denied because the 26 years of service credited to him before 1962 were disallowed under the plan's two-year break-in-service provision. Hence, the fund determined that Knauss had not qualified for benefits because he had earned only six years of service credit since his break in service. *Id.* at 83–84.

Knauss brought suit claiming that the two-year break-in-service provision arbitrarily excluded employees from benefits and therefore failed to operate for the sole and exclusive benefit of employees as required by § 302(c)(5). The district court entered judgment for the defendants, but the court of appeals reversed and remanded. The court found that Knauss had established, at least *prima facie,* that the break-in-service rule was arbitrary. The court relied upon several factors to support its conclusion. First, the court observed that "[b]ut for the cancellation effected by his interruption in employment, Knauss had accumulated more than sufficient years of service . . . to entitle him to a pension." *Id.* at 88. Second, the court was influenced by the fact that Knauss' break was involuntary—the result of his employer's bankruptcy and the unavailability of other covered employment. *Id.* at 88–89. Third, the break-in-service rule made exception for employees absent from covered employment because they were on strike, self-employed, or transferred to supervisory positions. Finally, the court was persuaded by two equitable considerations: Knauss would have been eligible for retirement benefits in 1962 had he been of retirement age at that time; and contributions had been made to the

fund on Knauss' behalf for eleven years where only ten years of service were required to receive benefits under the plan. *Id.* at 89. Based upon all of these considerations, the court concluded:

> Thus, at least where a break-in-service provision deprives an otherwise eligible employee of all benefits derived from substantial contributions made in his behalf, § 302(c)(5) requires that the defenders of such provision come forward with substantial justification for the stipulation in terms of the Fund's legitimate goals.

*Id.* (footnote omitted). A remand was ordered for the purpose of making findings as to the actuarial necessity for the break-in-service provision.

Dudo contends that the facts surrounding his claim are identical in all material respects to those in *Knauss.* But for his break in service, he would have been eligible for retirement benefits; his absence from covered employment was completely involuntary; and defendants have failed to come forward with evidence to establish substantial justification for the three-year break-in-service rule. Defendants, on the other hand, find the facts of *Knauss* readily distinguishable in several respects. First, defendants point out that contributions were made on Knauss' behalf for eleven years, and only ten years of service were necessary to be eligible for benefits. In Dudo's case, on the other hand, contributions were made on his behalf for only 5.5 years, and the Plan required 20 years of service to receive benefits. Hence, defendants highlight that nearly all of Dudo's forfeited service credit was past service credit, rendered before the operative date of the Plan and without any expectation of future reward. Second, defendants point out that, unlike in *Knauss,* no exception is made under the break-in-service provision for employees who are absent from covered employment because they are on strike, employed as union officers,[9] or in supervisory

---

**9.** With the sole exception of employees absent due to disability, all time away from covered employment is included by the Trustees for purposes of applying the break-in-service rule.

Union officers are considered to be in covered employment since the union is obligated to make contributions to the Fund on the officers' behalf.

positions. Third, defendants deny that Dudo's break in service was due to circumstances beyond his control. Finally they contend that they have shown actuarial necessity for the break-in-service rule.

I conclude that Dudo has not established a *prima facie* case that the break-in-service rule is arbitrary and capricious as it applies to him. Break-in-service rules are not in themselves arbitrary and capricious. *Van Fossan v. International Brotherhood of Teamsters Union Local No. 710 Pension Fund*, 649 F.2d 1243, 1248 (7th Cir.1981); *Burroughs v. Board of Trustees*, 542 F.2d 1128, 1131 (9th Cir.1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Kozlesky v. Board of Trustees*, 546 F.Supp. 466, 468 (E.D.Mich.1982); *Vermeulen v. Central States, Southeast & Southwest Areas Pension Fund*, 490 F.Supp. 234, 238 (M.D.N.C.1980); *Mosley v. National Maritime Union Pension & Welfare Plan*, 438 F.Supp. 413, 422 n. 8 (E.D.N.Y.1977). Indeed, break-in-service rules, equally as, or more restrictive than the three-year rule in issue here, have withstood reasonableness challenges in several cases. *See, e.g., Wilson v. Board of Trustees*, 564 F.2d 1299 (9th Cir.1977); *Giler v. Board of Trustees*, 509 F.2d 848 (9th Cir.1975) (per curiam); *Kozlesky v. Board of Trustees, supra; Vermeulen v. Central States, Southeast & Southwest Areas Pension Fund, supra*. A closer reading of the case law in this area reveals a common thread running through each of the cases where break-in-service rules have been found to be arbitrary and capricious. In each case, the rule operated to deprive employees who otherwise would be eligible for benefits even though their breaks in service were "involuntary" in the sense that they had no reasonable opportunity to protect themselves from the impact of the rule. *See, e.g., Norton v. I.A.M. National Pension Fund*, 180 U.S.App.D.C. 176, 553 F.2d 1352 (1977); *Burroughs v. Board of Trustees, supra; Lee v. Nesbitt*, 453 F.2d 1309 (9th Cir.1972); *Kraft v. Felder*, 452 F.Supp. 933 (S.D.N.Y.1978). The involuntariness element was recently discussed at length by the Court of Appeals for the Seventh Circuit in *Van Fossan v. International Brotherhood of Teamsters Union Local No. 710 Pension Fund, supra*:

> We believe the distinction between voluntary and involuntary breaks in service is crucial to determining the arbitrariness of the operation of a given break in service rule. We believe that, ... Trustees have a valid interest in limiting the pension rights of the transient employee by means of a break in service rule. Yet, the application of a break in service rule to any employee who faithfully puts in his twenty years and then, through no fault of his own, is forced to leave covered employment is simply arbitrary. To permit the break in service rule to operate in such a fashion would allow an employer to terminate an employee who has the requisite years but not attained retirement age less the break in service period, and effectively eliminate that employee's right to a pension.

649 F.2d at 1248 (footnote omitted). *See also Sailer v. Retirement Fund Trust*, 599 F.2d 913, 914 (9th Cir.1979); *Vermeulen v. Central States, Southeast & Southwest Areas Pension Fund, supra*, 490 F.Supp. at 238.

Bearing in mind that Dudo has the burden of establishing that his break was involuntary, *Adams v. New Jersey Brewery Employee's Pension Trust Fund*, 670 F.2d 387, 398 (3d Cir.1982); *Lee v. Nesbitt supra*, 453 F.2d at 1312, I now examine the proofs on the issue. Dudo first asserts that his acceptance of non-covered employment with Charles Benjamin, Inc. (Benjamin) was the product of improper inducement by the Trustees. I reject this assertion since no evidence has been adduced to establish that Dudo ever communicated with anyone from the Fund concerning the watchman's position with Benjamin. To the extent that Dudo may have received improper advice from an officer of Local 107, I state only that nothing the officer said or implied can be attributed to the Trustees.

Dudo next seeks to attribute his break in service to the unavailability, with covered employers, of jobs he was capable of performing following his back injury in July 1960. As suggested by his proposed findings, Dudo posits that, following his back injury, he could not perform the lifting and bending required of the local driving he had done previously. He admits that, by the end of 1960, he had recovered sufficiently to return to covered employment as an over-the-road driver. Nevertheless, he maintains that despite his efforts to secure that employment, none was available.

Defendants argue that Dudo has not established by a preponderance of the evidence that he was either (1) physically incapable of working as a local driver during the period of his break in service or (2) unable to find a job as an over-the-road driver during that period. I agree. Dudo's break in service did not begin until the second quarter of 1962. There is no question that he was able at that time to perform over-the-road work. Although he argues that he could not perform local driving at that time, I find the evidence insufficient to support that argument. Dudo's testimony[10] concerning his inability to lift and bend is hardly convincing. It appears from his testimony that he was merely bothered by such tasks, not that he was incapable of performing them. Apart from Dudo's testimony that he suffered a back injury, there is nothing in the record to indicate the nature and extent of that injury. No medical evidence was offered. Further, Dudo testified that his doctor advised him near the end of 1960 to try to return to his former work. As for the medical advice or treatment Dudo received after that, the record is silent. Again, I point out that

Dudo's break in service did not *begin* to run until well over a year after his doctor advised him to try to return to work. In sum, on this record, I cannot find that Dudo was incapable of working as a local driver during the years 1962 through 1966. Since no argument is made that local driving jobs were unavailable, Dudo has not met his burden of establishing that his break was involuntary.

Even if Dudo were incapable of performing local driving, he has not met his burden of establishing that over-the-road jobs were unavailable during the 3-year period beginning after the first quarter of 1962, *i.e.* after his break in service began. To avoid a break in service, Dudo had only to work a single day within that period. He did testify that he went to the union hall on occasion to seek such employment, but the extent of his efforts is uncertain. It is clear from social security records that Dudo had no earnings subject to withholding from the second quarter of 1962 until he accepted employment with Benjamin in 1964. Dudo did not testify that he had earnings during that period which were not subject to withholding. Hence there is no evidence that Dudo had *any* gainful, non-covered employment during the period which would have prevented him from reporting regularly to the union hall to seek covered employment. Nor is there any evidence that he sought, even on an infrequent basis, to obtain covered employment during his tenure as "watchman" for Benjamin.[11] In my view, if there is any substance to the rule that break-in-service rules are not per se arbitrary, a plaintiff must come forward with more than that offered by Dudo to establish that the break in service was unavoidable.[12]

10. Dudo suffered a stroke before the trial and consequently was unable to testify. The testimony he had given at his deposition on August 22, 1979, was therefore admitted into evidence.

11. There is evidence, which I credit, that the watchman's position with Benjamin was a "paper job". Therefore, Dudo's failure to offer evidence as to the efforts he made to secure covered employment during the time he supposedly was employed by Benjamin further supports my finding that his break in service

was not attributable to a shortage of covered employment.

12. Plaintiff in his proposed findings submits that 20 years of service credit were cancelled because of the break as opposed to the 19.5 years which I have found were cancelled. Because I find that Dudo voluntarily left covered employment, this difference is immaterial. Even if Dudo had the requisite 20 years of service credit in 1962, he still would not have had a vested right to early retirement benefits

**1344**

Finally, it must be recognized that, unlike in *Knauss,* the break in service rule here operated only to deprive Dudo of five-and-one-half years of contributions made on his behalf, not enough to qualify Dudo for a pension. Thus, most of Dudo's cancelled service credit was past service credit. While Dudo's situation is most unfortunate, I cannot under all the above-discussed circumstances conclude that the three-year break-in-service rule is arbitrary. Moreover, because Dudo has not shown that his break in service was involuntary, it is not incumbent upon the Trustees to demonstrate the actuarial necessity for the rule's failure to make exception for employees who suffer an involuntary break.

### CONCLUSIONS OF LAW

1. Subject matter jurisdiction over this action exists under 29 U.S.C. § 186(e).

2. The dual break-in-service scheme adopted by the Trustees in 1976 is not arbitrary.

3. Dudo has failed to establish by a preponderance of the evidence that his break in service was involuntary.

4. The 3-year break-in-service rule is not arbitrary and capricious.

5. Defendants did not violate § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), in denying Dudo's applications for retirement benefits.

6. Defendants are entitled to judgment in their favor.

until he reached 50 years of age. Dudo did not become 50 until 1967, after his break in service

was complete. *See Lee v. Nesbitt, supra.*